**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR09-1240-PHX-DGC |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Kenneth Douglas Murray, | ) | |
| Defendant. | ) | |

Defendant Kenneth Douglas Murray is charged with possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(5)(B) and 2256. He has filed two motions to suppress. One motion seeks to suppress all evidence obtained by means of a search warrant executed at his home on November 2, 2007. Dkt. #27. The other motion seeks to suppress statements made by Defendant during questioning at his home on the same day. Dkt. #26. The motions have been fully briefed, and an evidentiary hearing was held on March 4, 2010. For reasons that follow, the Court will deny both motions.

**I.     Motion to Suppress the Search Warrant.**

On October 31, 2007, Special Agent Diedre Gotjen of the Federal Bureau of Investigation presented a 53-paragraph affidavit to United States Magistrate Judge Michelle H. Burns. On the basis of the affidavit, Judge Burns signed a search warrant authorizing the FBI to search Defendant's house located at 3975 South Hollyhock Place, Chandler, Arizona. The warrant authorized agents to seize computers, computer devices, papers, and other materials that may be related to the possession of child pornography. Dkt. #43-1.

The search warrant was executed early on the morning of November 2, 2007. The details of the search will be discussed in part II of this order. Defendant's computer was seized, and on it were found multiple images of child pornography.

Defendant argues that the search warrant was not supported by probable cause because the evidence contained in Agent Gotjen's affidavit was stale. Defendant also contends that the affidavit contained insufficient information regarding sources relied on by the FBI, and that the categories of items covered by the warrant were overly broad.[1]

**A. Legal Standards.**

To be valid under the Fourth Amendment, search warrants must be supported by probable cause. In assessing the existence of probable cause, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for concluding' that probable cause existed." *Id*. at 238-39 (quoting *Jones v. U.S.*, 362 U.S. 257, 271 (1960) (ellipses and brackets omitted)). The Court must remember that a "fair probability" does not amount to "certainty or even a preponderance of the evidence," and that the Court must not "flyspeck" the affidavit through *de novo* review. *U.S. v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc). The magistrate judge's determination "should be paid great deference." *Gates*, 462 U.S. at 236.

**B. Agent Gotjen's Affidavit.**

"'All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath.'" *Gourde*, 440 F.3d at 1067 (quoting *U.S. v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971)). The information

---

[1] Defendant's motion to suppress initially asserted that, under *Franks v. Delaware*, 438 U.S. 154 (1978), the search warrant was based on reckless or misleading information. Defendant chose not to pursue this argument at the evidentiary hearing, instead asserting that Agent Gotjen's affidavit failed to establish probable cause.

that follows is taken from the affidavit submitted by Agent Gotjen to Magistrate Judge Burns. *See* Dkt. #43-1.

On July 10, 2006, the Dutch National Police ("DNP") conducted an investigation that targeted a bulletin board system known to be involved in the distribution of child pornography. While examining the bulletin board, the DNP observed a link that included four files available for download. The DNP downloaded the files and found that each contained more than 100 images of child erotica and child pornography. Agent Gotjen's affidavit described in detail six photographs from the files. The descriptions included the positions of the minor females and the portions of their bodies that were the focus of the photographs, leaving no doubt that the images constituted child pornography.

Agent Gotjen explained in the affidavit that she is a member of the FBI Innocent Images Task Force, Sexual Assault, Felony Enforcement Team in Phoenix, Arizona. She stated that she had reviewed the four files downloaded by the DNP, including the six photographs described in the affidavit, and found the files to contain child pornography.

The affidavit explained that the DNP's investigation found that the four files were distributed from the website www.filehd.com, a domain registered to a company named File HD in Uden, Netherlands. The DNP contacted File HD and obtained the Internet Protocol ("IP") addresses, as well as the dates and times, of individuals who downloaded or attempted to download the four files.

The information collected by the DNP was forwarded to the United States Department of Justice. Analysis conducted by the FBI found that IP address 130.13.104.126, as assigned on May 20, 2006, had downloaded all four of the child-pornography-containing files. An FBI search conducted through the American Registry of Internet Numbers revealed that the IP address was registered to Qwest Communications. On March 14, 2007, an administrative subpoena was issued to Qwest Communications for information related to the IP address as assigned on May 20, 2006. In response, Qwest disclosed that the IP address, on that date and at the time the files were downloaded, was assigned to Defendant Kenneth D. Murray at 3975 South Hollyhock Place, Chandler, Arizona.

With this information in her possession, Agent Gotjen undertook to verify that Defendant actually resided at the address provided by Qwest. Agent Gotjen conducted surveillance of the house in September of 2007. She observed a vehicle parked in the driveway. A check on the vehicle's license plate through the Arizona Motor Vehicle Division revealed that the vehicle was registered to Kenneth D. Murray at the South Hollyhock address. A driver's license query for Kenneth D. Murray also disclosed that he resided at the South Hollyhock address. A query of Maricopa County property information revealed that Kenneth D. Murray had purchased the South Hollyhock residence in 1998.

On September 17, 2007, a further query of Qwest revealed that the telephone number previously provided by Qwest as belonging to Kenneth D. Murray was still active. On October 26, 2007, Agent Gotjen placed a ruse phone call to Kenneth Murray. Murray confirmed during the call that he still received bundled phone, cable, and Internet services from Qwest. An additional inquiry of Qwest on October 29, 2007, confirmed that Kenneth Murray received uninterrupted Internet Service at his residence from May 20, 2006 through October 3, 2007.

On the basis of Agent Gotjen's knowledge, training, and experience, as well as the experience of other FBI agents with whom Agent Gotjen had spoken, the affidavit stated that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. The affidavit explained that when a person deletes a file on a home computer, the data contained in the file does not actually disappear. Rather, the data remains on the hard drive until it is overwritten by new data. Therefore, deleted files or even remnants of deleted files may reside in free space or slack space – that is, space on the hard drive that is not allocated to an active file. The affidavit noted that a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

Based on Agent Gotjen's experience and the experience of other agents, the affidavit further stated that computer data can be stored on a variety of systems and storage devices

1 including hard drives, floppy disks, CD-ROMs, DVDs, PDAs, multi-media cards, memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks. The affidavit further stated, based on the experience and training of Agent Gotjen and other agents, that several characteristics are generally found to exist in individuals who collect child pornography. The majority of individuals who collect such pornography are persons with a sexual attraction to children. The majority of such individuals collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, videotapes, books, computer graphics, or digital or other images. A majority of these individuals also collect child erotica, which consists of images or text that do not rise to the level of child pornography, but which nonetheless fuel their sexual fantasies regarding children.

Agent Gotjen also explained on the basis of her training and experience, as well as the training and experience of other agents, that the majority of individuals who collect child pornography rarely dispose of their sexually explicit materials, and may go to great lengths to conceal and protect their collections from discovery, theft, and damage. They almost always maintain their collections in the privacy of their homes or other secure locations.

On the basis of this information, Agent Gotjen requested a warrant to search for and seize computer hardware and associated materials that she believed would contain some or all of the photographs described in the warrant and that were downloaded on May 20, 2006. Judge Burns reviewed the affidavit and signed the search warrant on October 31, 2007. The warrant was executed on November 2, 2007. To date, the government has found thousands of pornographic images on Defendant's computer, including child pornography and at least one photograph from the files downloaded from the Netherlands on May 20, 2006.

**C.     The Affidavit Established Probable Cause.**

Considering the totality of the circumstances, the Court concludes that Magistrate Judge Burns had a substantial basis for concluding that there was a fair probability that evidence of child pornography would be found through the search warrant. The affidavit provided considerable detail concerning the investigation conducted by the DNP, including

the date on which the investigation commenced, the nature of the four files discovered by the DNP on a bulletin board, the website from which the four files were distributed, the company that owned the website, and the company's location in the Netherlands. The affidavit disclosed that information collected by the DNP, including the four files, were delivered to the Department of Justice. The four files were reviewed by experts at DOJ and by agent Gotjen herself, and were found to contain child pornography.

The affidavit further explained that analysis of the information provided by the DNP revealed that a particular IP address had downloaded the four files on May 20, 2006. The FBI conducted an investigation of this address, ultimately finding that it was assigned to Defendant. The FBI's investigation confirmed that Defendant in fact resided at the physical address shown for the IP address and had used the IP address at that location on May 20, 2006.

This information left little doubt that Defendant had downloaded the four files on May 20, 2006. The Court has no difficulty concluding that this evidence established a high likelihood that Defendant had received and possessed the child pornography contained in the four files.

Defendant's primary argument is that the evidence was stale by October 31, 2007, the date of Agent Gotjen's affidavit. Some 17 months had passed since the four files were downloaded to Defendant's IP address. Defendant contends that there was no reasonable basis for believing that any child pornography was still in Defendant's possession or would be located through a search of his residence and computer.

As the Ninth Circuit repeatedly has recognized, however, expert opinion may be presented in a search warrant affidavit and may provide valuable context for conducting the "fair probability" inquiry. *See Gourde*, 440 F.3d at 1073 ("The details provided on the use of computers by child pornographers and the collector profile strengthen [the inference that child pornography will still be in the collector's possession] and help provide context for the fair probability" inquiry[.]) (internal quotations and citations omitted); *U.S. v. Hay*, 231 F.3d 630, 636 (9th Cir. 2000) (reasoning that the collector profile "form[ed] the basis upon which

the magistrate judge could plausibly conclude that those files were still on the premises"); *U.S. v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) ("It is well established that expert opinion may be presented in a search warrant affidavit."). Agent Gotjen's expert opinion, based on her training and experience and the training and experience of other FBI agents, established that child pornography images downloaded to a computer can remain for an extended period of time, even years. This is true even if the images are deleted by the computer user. The reliability of such opinions has been acknowledged by the Ninth Circuit:

> Thanks to the long memory of computers, any evidence of a crime was almost certainly still on [defendant's] computer, even if he had tried to delete the images. FBI computer experts, cited in the affidavit, stated that even if graphic image files have been deleted these files can easily be restored. In other words, [defendant's] computer would contain at least the digital footprint of the images.

*Gourde*, 440 F.3d at 1071 (quotation marks, ellipsis, and brackets omitted); *see also U.S. v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (holding that the nature of the crime involving child pornography, as set forth in the affidavit, "provided 'good reason[]' to believe the computerized visual depictions downloaded by Lacy would be present in his apartment when the search was conducted ten months later").

Agent Gotjen also provided expert opinion that collectors of child pornography rarely dispose of their sexually explicit materials. The Ninth Circuit has relied on similar FBI expertise to note that collectors of child pornography "act like 'pack rats' because they have difficulty obtaining images of child pornography. As such, they are inclined to download and keep such images for a long period of time, and they rarely, if ever, dispose of their sexually explicit materials. This profile tracks the collector profiles that supported a finding of probable cause in other cases in this circuit and others." *Gourde*, 440 F.3d at 1072 (quotation marks omitted); *see also Lacy*, 119 F.3d at 746 ("[T]he affiant explained that collectors and distributors of child pornography value their sexually explicit materials highly, 'rarely if ever' dispose of such material, and store it 'for long periods' in a secure place, typically in their homes."); *U.S. v. Martin*, 426 F.3d 68, 75 (2nd Cir. 2005) (same).

Given the expert opinions provided in Agent Gotjen's affidavit, Magistrate Judge Burns reasonably found a "fair probability" that child pornography images would still be on Defendant's computer 17 months after he downloaded them from the Netherlands site. Although this period is longer than the ten-months addressed by the Ninth Circuit in *Lacy* and the four months addressed in *Gourde*, the durability of pornographic images once downloaded to a computer, when combined with the propensity of collectors to retain the material indefinitely, supported Judge Burns' conclusion. Other courts have reached similar conclusions. *See U.S. v. Morales-Aldahondo*, 524 F.3d 115, 118 (1st Cir. 2008) (information not stale despite being years old because special agent attested that those who download child pornography tend to retain images for years and use computers to augment and store collected images); *U.S. v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) (information not stale despite being years old because pedophiles are likely to hoard images of child pornography in their homes for extended periods of time).

The Court also notes that this investigation had international origins, arising in the Netherlands, being transmitted to the Department of Justice, and ultimately being forwarded to the FBI in Phoenix for final investigation. The investigation by the DNP was commenced in July of 2006. After the pornographic images had been found, downloaded, and analyzed, and the source had been traced to a Netherlands company, the information was forwarded to the United States. Agent Gotjen's affidavit notes that administrative subpoenas were issued in the United States in March of 2007, ultimately revealing Defendant's IP address. Agent Gotjen conducted further investigations in September and October of 2007 to confirm that Defendant resided at the physical location identified with the IP address. Although the necessary length of international, multi-agency investigations cannot justify the use of stale evidence, the Court notes that this does not appear to be a case simply of slow law enforcement. Between March and October of 2007, agents in the United States analyzed DNP information, searched the American Registry of Internet Numbers, served administrative subpoenas, conducted physical surveillance of Defendant's premises, checked Arizona driver's license, vehicle registration, property ownership, and telephone information,

1  and made further inquiries of Qwest Communications. These efforts ultimately led to a clear
2  and probative indication that Defendant had in fact downloaded the four files, containing
3  more than 400 photographs, on May 20, 2006. Agent Gotjen's expertise and that of other
4  agents, as recounted in the affidavit, established a fair probability that the images were still
5  in Defendant's possession in October of 2007. Considering the totality of the circumstances
6  and affording appropriate deference to Judge Burns' determination, the Court concludes that
7  the search warrant should not be suppressed for lack of probable cause.

### D.     Defendant's Cases.

Defendant relies heavily on the Ninth Circuit's 1991 decision in *Weber* to argue that Agent Gotjen's affidavit failed to establish probable cause. But *Weber* concerned hard-copy child pornography sent through the mail, not Internet child pornography downloaded to computers. 923 F.2d at 1340. *Weber* thus lacked the significant long-term retention capacity of computers, a factor that contributed significantly to the Ninth Circuit's finding of probable cause in *Gourde*. 440 F.3d at 1071 (stating that "these images were almost certainly retrievable from his computer if he had ever received or downloaded them").

Defendant also relies heavily on *United States v. Greathouse*, 297 F.Supp. 2d 1264 (D. Or. 2003). The district court in *Greathouse* concluded that child pornography evidence became stale after one year unless accompanied by evidence of additional criminal activity. *Id*. at 1273. *Greathouse*, however, was also decided before the Ninth Circuit's en banc decision in *Gourde*. *Greathouse* concluded, apparently without support from the search warrant affidavit, that computer equipment becomes obsolete very quickly and Internet images downloaded by a computer user may therefore be lost through computer upgrades. *Gourde*, by contrast, looked to the expert opinion contained in the search warrant affidavit, which noted that images downloaded to computers are retained for an extended period of time. 440 F.3d at 1071. In this case, Agent Gotjen expressed her expert opinion, and that of other FBI agents, that digital images are retained in a computer's memory, intentionally or unintentionally, for years. The Court concludes that this evidence provided a substantial basis for Judge Burns' finding of a fair probability. The Court cannot conclude that the

1 possibility of frequent computer upgrades, relied on by the court in *Greathouse*, is so great
2 as to defeat fair probability in this case. Even those who frequently upgrade computers do
3 so only every two or three years. Moreover, older computers often are retained in the home
4 or office and continue to store an extensive digital memory. In light of Agent Gotjen's expert
5 opinion that digital images can be retained for years, the Court cannot rely on its own view
6 of computer upgrades to conclude that Defendant was unlikely to have retained digital
7 images for 17 months. The affidavit in this case provided a substantial basis for Judge Burns
8 to conclude that Defendant likely retained some or all of the more than 400 images he
9 downloaded from the Netherlands on May 20, 2006.

**E.     Overbreadth.**

Defendant complains that the search warrant was over broad because it included letters, diaries, cameras, film, photographs of minors, address books, mailing lists, and documents related to Defendant's ownership of the residence. Dkt. #27 at 9. But when a portion of a search warrant is overly broad, federal courts generally invalidate only the overly broad portion and suppress evidence seized pursuant to that portion. *See, e.g., U.S. v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir. 1984); *U.S. v. Sells*, 463 F.3d 1148, 1153-62 (10th Cir. 2006); *U.S. v. Timley*, 443 F.3d 615, 620 (8th Cir. 2006). Defendant has identified no evidence that was seized pursuant to the allegedly over broad portions of the search warrant he has identified. The key evidence in this case – multiple images of child pornography – were found on Defendant's computer. Given the facts set forth in Agent Gotjen's affidavit, the Court cannot conclude that the portion of the search warrant authorizing seizure of Defendant's computer was overly broad.

**F.     Good Faith Exception.**

The Supreme Court has held that evidence obtained under a facially valid search warrant, which is later found to be invalid, is admissible if the executing officers acted in good faith and had an "objectively reasonable belief in the existence of probable cause." *U.S. v. Leon*, 468 U.S. 897, 926 (1984). For all of the reasons outlined above, the Court concludes that objectively reasonable law enforcement officers would find probable cause

to believe that Defendant was in possession of child pornography on the date of the search, and that the search warrant therefore was valid. The investigation had carefully pinpointed Defendant as the individual who downloaded child pornography on May 20, 2006, at the South Hollyhock residence. The expertise and training of the law enforcement officers confirmed that collectors of child pornography rarely dispose of it, and that images downloaded to a computer persist for years. Because the agents were about to search the physical residence where the images had been downloaded, they could believe, on an objectively reasonable basis, that child pornography would be found. Thus, even if the Court were to conclude that the evidence in this case was too stale to support probable cause, the motion to suppress would be denied on the basis of the good faith exception.

**II.     Motion to Suppress Defendant's Interview.**

The search warrant was executed on the morning of November 2, 2007. Defendant was interviewed by Agent Gotjen and City of Phoenix Police Detective Chris Curley during the course of the search. Defendant makes three arguments. First, Defendant contends that the interview was custodial and that he should have been given a *Miranda* warning. Second, Defendant contends that he stated, several times, that he did not want to answer questions. He argues that the officers should have ceased their questioning when he made these statements. Third, Defendant contends that his statements were not voluntary.

**A.     The Interview.**

The following facts are based on testimony presented at the March 4, 2010 evidentiary hearing, including credibility determinations. The Court heard testimony from Agent Gotjen, Detective Curley, and Defendant. The following facts are also based on the audio recording of the November 2, 2007 interview.

Agent Gotjen and the other officers arrived at Defendant's house at 6:45 a.m. on November 2, 2007. Ten federal agents, two police officers, and one photographer were present to execute the search. All of the law enforcement personnel were dressed in casual clothing, but each wore a ballistic vest that read either "FBI" or "Police." Each officer carried a sidearm. No marked police cars were visible at the house.

1    Six to eight officers approached Defendant's front door, knocked, and announced their
2    presence. The agents had their guns drawn. The agent at the front of the line was pointing
3    his gun into Defendant's house. The other agents had their guns pointed at the ground.
4    When Defendant answered the door, he was asked to step outside. He complied, and
5    remained outside the front of the house, seated on a bench, while six to eight officers
6    conducted a security sweep of the residence. While in front of his house, Defendant was
7    accompanied by one or two officers. He was not restrained.[2]
8    Defendant sat in front of his house for approximately 20 minutes while agents secured
9    the residence. Defendant was dressed in a t-shirt, gym shorts, and slippers. When it was
10   apparent he was cold, one of the officers went into the house and retrieved additional
11   clothing for Defendant. Agent Gotjen told Defendant the agents were conducting a security
12   sweep of the house and that he was not under arrest.
13   After the security sweep was concluded, Agent Gotjen, Detective Curley and the other
14   officers took off their ballistic vests. Officer Curley wore a t-shirt and blue jeans, Agent
15   Gotjen was dressed in casual clothing, and none of the other officers was in uniform. All
16   weapons were holstered. Detective Curley moved his weapon to his ankle where it was not
17   visible under his trousers.
18   Agent Gotjen told Defendant that she would like to explain what they were doing,
19   provide him with a copy of the search warrant, and ask him some questions. Defendant
20   voluntarily accompanied Agent Gotjen to the back patio of his home where the officers had
21   placed a card table and three chairs. Defendant sat at the table with Agent Gotjen and
22   Detective Curley during the interview. No other law enforcement officers were present in
23   the vicinity of the interview or in the backyard. Photographs placed in evidence during the
24   evidentiary hearing show that Defendant has a relatively large backyard, covered in grass.
25   The card table and chairs were located on a covered patio in the backyard.

---

[2] In his motion to suppress, Defendant asserted that he was handcuffed by the officers. Dkt. #26. His counsel withdrew this assertion at the evidentiary hearing on March 4, 2010.

1 | Detective Curley recorded the interview of Defendant. A transcript of the recording was provided to the Court. *See* Dkt. #39-1. In addition, the Court listened to the full interview on a DVD provided by the government. Defense counsel stated he had no objection to the transcript or the DVD.

Defendant works as a quality engineer at Orbital Sciences. His testimony during the evidentiary hearing reflected that he is composed and articulate, and appears to be well educated. Both officers testified that Defendant was alert and calm during the interview, and that he did not appear to be impaired in any manner. During the interview, Defendant was clothed in a t-shirt and trousers.

The interview started at 7:05 a.m. Agent Gotjen explained that the officers were there to execute a search warrant and said: "You are not under arrest and your [sic] free to leave at any time." Dkt. #39-1 at 2. Agent Gotjen told Defendant they were going to record the interview. *Id*. at 3. She then said again: "As I explained to you earlier, you are not under arrest. Were [sic] here to execute the, a search warrant. Ah, on your premises. You are free to leave at any time." *Id.*

Agent Gotjen provided Defendant with a copy of the search warrant. He took approximately five minutes to read it. No questions or comments were made during this five-minute period. After Defendant had reviewed the search warrant, Agent Gotjen and Detective Curley began asking Defendant questions. Early in the conversation, Defendant said: "I don't have anything to say." He then followed this immediately by stating: "I think that's the best answer. I don't have anything to say." *Id*. at 6. The agents continued their questioning. Several minutes later, Detective Curley asked Defendant when he had last downloaded child pornography. Defendant asked if he had to answer that kind of a question. Detective Curley said "You don't have to answer anything." He then added: "Like I said, you're not under arrest." When Defendant said it seemed like he should not be responding to these questions, Detective Curley replied: "That's up to you. This is just your opportunity to tell your side of it." *Id*. at 13.

1  Defendant proceeded to answer questions, eventually admitting that he possessed
2  child pornography for his own personal gratification. Later in the interview, Agent Gotjen
3  again told Defendant that he was free to leave. Defendant ultimately did elect to leave his
4  home. He dressed for work and left while the officers were still conducting the search. He
5  agreed with the officers that they would leave a key under the doormat and depart through
6  the side gate.

7  Defendant's interview concluded at 7:42 a.m. The entire interview thus lasted 37
8  minutes. When the five-minute period during which Defendant was reviewing the search
9  warrant is subtracted, the questions and answers lasted 32 minutes.

10  As reflected in the recording of the interview, Agent Gotjen and Detective Curley
11  conducted themselves in a polite and friendly manner. They were not commanding or
12  authoritative in their tone. Both officers testified that no threats were made and no coercion
13  was used, nor were promises made to induce Defendant's cooperation.

14  Defendant testified that he was shocked and intimidated by the arrival of a large
15  number of armed law enforcement officers at his house early in the morning. He testified
16  that the officers awoke him from sleep when they knocked loudly on the front door. He
17  further testified that he did not feel free to leave because there were officers in his house
18  conducting a search.

19  **B.  Legal Standard.**

20  In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), the Ninth Circuit
21  addressed a question of first impression: "Under what circumstances under the Fifth
22  Amendment does an interrogation by law enforcement officers in the suspect's own home
23  turn the home into such a police-dominated atmosphere that the interrogation becomes
24  custodial in nature and requires *Miranda* warnings?" *Id*. at 1077. *Craighead* noted that a
25  suspect is considered "'in custody' for purposes of *Miranda* if the suspect has been 'deprived
26  of his freedom of action in any significant way.'" *Id*. at 1082 (quoting *Miranda v. Arizona*,
27  384 U.S. 436, 444 (1966)). "To determine whether the suspect was in custody, we first
28  examine the totality of the circumstances surrounding the interrogation. We then ask

whether a reasonable person in those circumstances would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (internal citation and quotations omitted).

This Court recently identified nine factors discussed by the Ninth Circuit in determining whether an interrogation is custodial. These include (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; (4) whether the suspect was informed that he was free to leave or terminate the interview and the context under which any such statements were made; (5) the language used to summon the individual; (6) the extent to which the defendant is confronted with evidence of guilt; (7) the physical surroundings of the interrogation; (8) the duration of the detention; and (9) the degree of pressure applied to detain the individual. *U.S. v. Salabye*, 623 F.Supp.2d 1010, 1013 (D. Ariz. 2009) (citing *Craighead,* 539 F.3d at 1085; *U.S. v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002)). The Court will consider each of these factors.

1. The search of Defendant's home included a large number of law enforcement officers. Ten federal agents, two state police officers, and a photographer arrived in the early morning hours of November 2, 2007. The officers wore vests that identified themselves as FBI or police, and each carried a weapon. The weapons of the six to eight officers who initially entered Defendant's home were drawn. The presence of such a large number of law enforcement officers, with weapons drawn, would intimidate any citizen, whether guilty or innocent, and weighs in favor of finding that Defendant's interview was custodial.

2. Defendant was not restrained. He was not placed in handcuffs, nor was he enclosed in a room. No physical force or threats were used during the course of the search or Defendant's interview. This is in contrast to *Craighead*, where the suspect was taken to a small storage room, the door was closed, and an armed police officer wearing a ballistic vest stood silently in front of the door, looking at the suspect, and did not participate in the interview. 539 F.3d at 1086.

3. Defendant was not isolated from others. In *Craighead* the suspect was physically separated from the Air Force officer who had been sent to provide him emotional support. *Id*. at 1087. In *Salabye*, the suspect was physically separated from his family. 623 F.Supp.2d at 1014. Defendant in this case lived alone. He stated during his interview that he rarely had visitors. He was not separated by the officers from other individuals who could provide comfort or assistance.

4. Defendant was informed three times during the 32-minute interview that he was free to leave. He was told twice that he was not under arrest. He was also told that he did not have to answer any questions. The recording of the interview reveals that these statements were made in a straightforward, candid manner, not in a tone that sought to minimize their importance. Agent Gotjen also testified credibly that she told Defendant before the interview that he was not under arrest.

5. Agent Gotjen summoned Defendant to the interview by stating that she would like to explain to him why the officers were there, show him a copy of the search warrant, and ask him questions. Defendant voluntarily accompanied her to the backyard for the interview. No threat, promise, or coercion was used to secure Defendant's participation in the interview.

6. Defendant was not confronted with evidence of his guilt. He was permitted to read the search warrant, which contained the facts recited in part I of this order, but Agent Gotjen and Officer Curley did not confront Defendants with evidence of his guilt during their questioning and did not use such evidence in an attempt to elicit statements from Defendant.

7. The physical surroundings of the interrogation were not confining. Defendant was located in his rather spacious backyard, sitting on a covered patio with the two officers at a card table. Defendant was not confined in a small storage room with an armed guard at the door as in *Craighead*, 539 F.3d at 1086, nor in the cab of a truck with a uniformed and armed officer as in *Salabye*, 623 F.Supp.2d at 1013. No other law enforcement officers were present or visible in Defendant's backyard, and neither interviewing officer was in uniform. Other officers were searching Defendant's residence during the course of the interview, but they were not visible from the patio. Moreover, "[t]he element of compulsion that concerned

the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings." *Craighead*, 539 F.3d at 1083.

8. Defendant's interview lasted 32 minutes. This is considerably shorter than the two hours and thirty-seven minutes of questioning in *Salabye*. 623 F.Supp.2d at 1014. Prior to the interview, Defendant sat in front of his house for 20 minutes while the house was secured, but the time between the arrival of the officers and the end of Defendant's interview was less than one hour.

9. As noted above, no pressure was applied to detain Defendant. He was told at least three times that he was free to leave. He was told repeatedly that he was not under arrest. He was told that he did not have to answer any questions. Ultimately, Defendant did choose to leave, departing the residence while law enforcement officers were still completing the search.

Considering all of these factors, the Court concludes that Defendant was not in custody. Although the first factor – the number of law enforcement officers and the fact that they were armed – weighs in favor of this being a custodial interrogation, the remaining eight factors weigh against such a conclusion. Defendant was not restrained, pressure and coercion were not applied, the interview occurred in his open backyard, only two officers were present during the interview, they were not in uniform, their guns were not drawn, Detective Curley's weapon was not visible, Defendant was not confronted with evidence of guilt, he was told repeatedly he could leave, he was told he did not have to answer questions, the questioning lasted 32 minutes and was conducted in a calm and courteous manner. The Court cannot conclude that a reasonable person in these circumstances would have felt that he or she was not at liberty to terminate the interview and leave.

**C.** **Defendant's Statements That He Had Nothing To Say.**

Defendant contends that he invoked his right to remain silent when he informed Agent Gotjen and Detective Curley that he had nothing to say, that their questioning should have stopped when he invoked this right, and that the balance of the interview should therefore be suppressed. But *Miranda* rights, including the right to remain silent, apply only to custodial

interrogations. *Illinois v. Perkins*, 496 U.S. 292, 296-97 (1990). If a suspect is not in custody, "then his attempts to invoke his right to remain silent and his *Miranda* right to counsel are ineffective." *U.S. v. Bautista*, 145 F.3d 1140, 1149 (10th Cir. 1998); *U.S. v. LaGrone*, 43 F.3d 332, 338-39 (7th Cir. 1994) (stating that a person cannot invoke his *Miranda* rights anticipatorily, but can only do so in custodial interrogation); *U.S. v. Pettiford*, 295 F. Supp. 2d 552, 561 (D. Md. 2003) (holding that a defendant could not invoke *Miranda* protections until he was in custody); *U.S. v. Drake*, 934 F.Supp. 953 (N.D. Ill. 1996) (holding that defendant could not invoke his *Miranda* rights because he was not in custody); *see also U.S. v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992) (holding that defendant's reference to his lawyer during an interview could not be an invocation of his *Miranda* rights because he was not in custody). As noted above, Defendant's interview by Agent Gotjen and Detective Curley was not custodial.

Defendant was told that he was not under arrest and that he was free to leave. He was told he did not have to answer any questions. Had he wished to remain silent, he could have stopped answering questions or left the premises as he eventually did. The Court cannot conclude that Defendant's constitutional rights were violated because he first stated that he had nothing to say, but then chose to remain and answer questions.

### D. Voluntariness.

Defendant argues that his statements should be suppressed because they were not voluntary. In deciding whether statements are involuntary, "[t]he test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *U.S. v. Leon-Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1998) (citing *Haynes v. Washington*, 373 U.S. 503, 513-514 (1963)). For the reasons set forth above, the Court concludes that the interview of Defendant was not coercive. His statements made during the calm, 32-minute interview in his backyard were not the result of his will being overborne.

**IT IS ORDERED:**

1. Defendant's motion to suppress evidence seized pursuant to the search warrant (Dkt. #27) is **denied**.
2. Defendant's motion to suppress statements made during his interview (Dkt. #26) is **denied**.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to commence on January 7, 2010 for a total of 62 days.

DATED this 9th day of March, 2010.

_David G. Campbell_
United States District Judge